# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

---

| | |
|---|---|
| Georgia Voter Alliance, John Wood, | Case _____ |
| Plaintiffs, | |
| vs. | **Complaint for Declaratory and Injunctive Relief** |
| Fulton County, | |
| Defendant. | |

---

The Plaintiffs make the following allegations for their complaint.

## Introduction

The Georgia Voter Alliance and John Wood bring this lawsuit against Fulton County, Georgia because federal law preempts private federal election grants to counties and cities. The Center for Tech and Civic Life (CTCL) has essentially created a constitutionally impermissible public-private partnership with one of Georgia's largest urban counties to run its federal elections on November 3, 2020. In total, CTCL has awarded $6,000,000 in private federal election grants to Fulton County.

The plaintiffs are injured by CTCL's private federal election grants because they are targeted to counties and cities with progressive voter patterns. The plaintiffs do not want progressive candidates to win in the November 3 elections. The government favoring a demographic group in elections is just as injurious to voters as the government disfavoring a demographic group. *See Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

To be sure, CTCL is free to directly spend its $250 million private federal election grant fund to get out the vote in Georgia; but, federal election law leaves discretion to the "states," not the counties and cities, on how to implement federal elections:

> The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.[1]

In fact, federal election law defines the word "state" to include only the 50 states and territories.

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.[2]

So, under federal election law, Georgia's counties and cities are not a state. Not being a state, Georgia's counties and cities are preempted from entering into a public-private partnership with CTCL for federal election administration by receiving CTCL's private federal election grant.

The following federal laws preempt Georgia's counties and cities from accepting and using CTCL's private federal election grants: U.S. Constitution's Elections Clause and Supremacy Clause, National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501-20511, Help America Vote Act (HAVA), 52 USC §§ 20901-21145. The state itself relies on the Secretary of State, as it did in 2020, to apportion millions of dollars of federal grants for federal elections to the counties. The CTCL grants did not follow the same process.

Because of the preemptive effects of these federal laws, Fulton County acted ultra vires, without legal authority, to form a public-private partnership with CTCL for federal

---

[1] 52 U.S.C § 21085, Pub. L. 107–252, title III, § 305 (Oct. 29, 2002), 116 Stat. 1714.
[2] 52 USC § 21141.

election administration by accepting and using CTCL's private federal election grant. The Plaintiffs are entitled to prospective declaratory and injunctive relief enjoining Fulton County from accepting and using CTCL's private federal election grants.

## Jurisdiction and Venue

1.      Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. § 1331, authorizing federal-question jurisdiction, for voters' Supremacy Clause claims involving federal election law preemption. *The League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D. Ohio 2004).

2.      Plaintiffs invoke this Court's jurisdiction under the private cause of action provided under HAVA, 52 U.S.C. § 21112, because the state has failed to provide the federally-required "appropriate remedy" of a timely, pre-election injunction for any person complaining against a Georgia local government forming a public-private partnership for federal election administration by accepting and using private federal election grants.

3.      Venue is proper in this Court under 28 U.S.C. § 1391 because at least one of the defendants, Fulton County, is located within the Northern District of Georgia, with offices within the Northern District of Georgia, and because many of the events or omissions regarding CTCL's federal election grants to the defendants giving rise to the claims presented occurred within the Northern District of Georgia.

## Parties

4.      Georgia Voter Alliance is an unincorporated association. The Georgia Voter Alliance is an association with members who seek to ensure, as part of their association objectives, public confidence in the integrity of Georgia's elections, in election results and

election systems, processes, procedures, and enforcement, and that public officials act in accordance with the law in exercising their obligations to the people of the State of Georgia. The Georgia Voter Alliance also works to protect the rights of its members whenever laws, statutes, rules, regulations, or government actions threaten or impede implied or expressed rights or privileges afforded to them under their constitutions or laws.

5.     Plaintiff John Wood is an eligible Georgia voter. John Wood has an interest because John Wood opposes the election of progressive candidates in local, state and federal elections.

6.     Defendant Fulton County is a Georgia county. Fulton County is not recognized as a "state" in federal law.

**Standing**

7.     The Supremacy Clause confers a private cause of action and legal standing on voters in federal elections to sue state and local governments based on election policies and customs which violate federal election law. *The League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D. Ohio 2004).

8.     HAVA, 52 U.S.C. § 21112, confers a private cause of action and legal standing on plaintiffs because they fit in the statutory category of "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)."

9.     As to plaintiffs' prospective remedies sought in this Court, HAVA, 52 U.S.C. § 21112, titled "Establishment of State-based administrative complaint procedures to remedy grievances" guarantees an "appropriate remedy" to "any person who believes that there is a

violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)" of HAVA.

10.     Under section (a) of 52 U.S.C. § 21112, Georgia, having received federal HAVA payments, is "required to establish and maintain State-based administrative complaint procedures which meet the requirements of paragraph (2)." Paragraph (2), among other things, requires that Georgia provide that:

> (F) If, under the procedures, the State determines that there is a violation of any provision of subchapter III, the State shall provide the <u>appropriate remedy</u>.

(Emphasis added.)

11.     However, in this case, O.C.G.A. § 21-2-50.2 and Ga. Comp. R. & Regs. R.590-8-2-.01 failed to provide the federally required "appropriate remedy" to "any person who believes that there is… [a HAVA] violation which has occurred, is occurring, or is about to occur" because there is effectively no pre-election injunctive relief allowed under O.C.G.A. § 21-2-50.2 and Ga. Comp. R. & Regs. R.590-8-2-.01.

12.     O.C.G.A. § 21-2-50.2 and Ga. Comp. R. & Regs. R.590-8-2-.01 fail to provide the immediate injunctive relief required to stop the defendants from accepting and using CTCL's private federal election grants before the November 3, 2020 election.

13.     O.C.G.A. § 21-2-50.2 and Ga. Comp. R. & Regs. R.590-8-2-.01 authorize no one, not even the Georgia Attorney General, to pursue injunctive relief for HAVA violations against Georgia's local governments.

14.     O.C.G.A. § 21-2-50.2 and Ga. Comp. R. & Regs. R.590-8-2-.01 are legally insufficient to satisfy the federal "appropriate remedy" requirement for "any person" filing a HAVA complaint in Georgia to obtain pre-election injunctive relief.

15.     Because O.C.G.A. § 21-2-50.2 and Ga. Comp. R. & Regs. R.590-8-2-.01 do not provide the federally required "appropriate remedy" under 52 U.S. Code § 21112, plaintiffs have a private cause of action and legal standing under 52 U.S.C. § 21112 to pursue pre-election prospective declaratory and injunctive relief in federal court.

16.     An actual controversy exists between the parties, Georgia Voter Alliance and the individual plaintiff who have suffered an injury-in-fact that is directly traceable to the defendants. 28 U.S.C. § 2201.

17.     The plaintiffs are injured by CTCL's private federal elections grants to Fulton County, totaling $6,000,000, in violation of federal law, which ensure legally authorized, uniform and fair federal elections.

18.     CTCL's private federal election grants to the Georgia county and cities tortiously interfere with plaintiffs' legal rights in Fulton County under federal law to legally authorized, uniform and fair federal elections. *See The League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D. Ohio 2004).

19.     A government's election policy favoring demographic groups is an equivalent injury to disfavoring demographic groups. "Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

20.     The plaintiffs do not want progressive candidates to win in the November 3 elections; the plaintiffs are injured by CTCL's private federal election grants because they are

targeted to counties and cities with progressive voter patterns—resulting in more progressive

votes and a greater chance that progressive candidates will win. *See, id.*

21.     Standing also exists on the premise that Defendants' conduct is

unconstitutionally influencing electoral outcomes—particularly in close elections—causing

an ultra vires problem.  The ultra vires problem is, "Are the state's Congressional election

winners elected or not when the Elections Clause is violated?"  *See, e.g., Bush v. Gore*, 531 U.S.

98 (2000) (Supreme Court determines Florida election contest in close Presidential

election).  When the Defendants violate the Elections Clause, they deprive Plaintiffs of

representation in Congress, as opposed to other states who will still be represented in

Congress.  So, in this case, the Defendants' invasion of federal elections by using the CTCL

grants, causing the ultra vires problem, is concrete and particularized injury to Plaintiffs,

fairly traceable to the Defendants' conduct, is likely, not speculative, and can be redressed by

a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (listing

elements for standing).

22.     The injury to the plaintiffs is real and concrete.

23.     This Court's favorable decision will redress the plaintiffs' injuries

and allow them to enjoy their rights to legally authorized, uniform and fair

federal elections guaranteed under federal law.

### Statement of Facts

24.     Fulton County is a local government in Georgia.

25.     Fulton County is not a state under federal law.

26.     The CTCL is a non-profit organization providing federal election grants to local governments.

27.     The CTCL was founded in 2012 by Tiana Epps-Johnson, Donny Bridges, and Whitney May.

28.     The CTCL headquarters is in Chicago, Illinois.

29.     The CTCL states that they are "a team of civic technologists, trainers, researchers, election administration and data experts working to foster a more informed and engaged democracy and helping to modernize elections."

30.     CTCL's mission on its website includes training public election officials in communication and technology and to inform and mobilize voters.

31.     CTCL's founders – Epps-Johnson, Bridges, and May – all previously worked at the New Organizing Institute (NOI), a center dedicated to training progressive groups and Democratic campaigns in digital campaigning strategies.

32.     NOI's executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012.

33.     Funders of CTCL include progressive groups such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation.

34.     CTCL is also associated with Rock the Vote, who despite their non-partisan claims, has regularly featured progressive policies in its efforts to mobilize young people in elections.

35. Along with Rock the Vote and The Skoll Foundation, CTCL also lists Facebook as a partner in their efforts.

36. On September 1, Mark Zuckerberg and Priscilla Chan announced their $300 million investment to promote "safe and reliable voting in states and localities." See Exhibit B.

37. Of that $300 million, $250 million is going toward CTCL and private federal election grants to counties and cities.

38. CTCL, as a progressive organization, targets urban counties and cities for its private federal election grants to turn out the progressive vote so progressive candidates win.

**CTCL's 2020 private federal elections grant application process.**

39. CTCL markets to local election offices the federal election grants as "COVID-19 response grants":

> We provide funding to U.S. local election offices to help ensure they have the critical resources they need to safely serve every voter in 2020. See Exhibit A.

40. CTCL states that it intends to award $250,000,000 of private federal election grants to local election offices for the November 3, 2020 elections and provides an application link to apply for the CTCL's private federal election grants.

> The Center for Tech and Civic Life (CTCL) is excited to expand our COVID-19 Response Grant program to all U.S. local election jurisdictions. Backed by a generous $250M contribution, CTCL will provide grants to local election jurisdictions across the country to help ensure you have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted.

> **APPLY FOR A COVID-19 GRANT**

> The deadline to apply is October 1, 2020. Questions about the COVID-19 grant application or process? Email us at help@techandciviclife.org.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

41.    CTCL, on its website, states that it will take about 45 minutes for the local election officials to gather information and fill out the application for CTCL's private federal election grants:

### CTCL COVID-19 Response Grant Application

We estimate it will take approximately 30 minutes to gather and prepare the materials needed to complete the COVID-19 Response Grant Application. We then expect that it will take approximately 15 minutes to complete the grant application questions below.

For an overview of what to expect when completing the grant application, including the materials you'll need to submit, visit https://www.techandciviclife.org/grants/

After submission of this information, CTCL may ask for additional information to help determine if your jurisdiction qualifies for a grant. CTCL reserves the right to verify with third party sources any information that you provide. By submitting this application, you consent to the collection of the information you submit, which may be used for the purposes described in CTCL's Privacy Policy.

- Who is completing this grant application? *
  [_____] First Name [_____] Last Name
- What is your title? *
  [_____]

- Please select the state and office (or official) you are applying on behalf of. *
- *NOTE: We are unfortunately not able to grant to election administrators in American Samoa or Guam under local law.*
- What type of jurisdiction are you submitting an application on behalf of? *
  ◉ County ◉ City ◉ Village ◉ Town ◉ Township ◉ State or Territory
  ◉ [_____]

- I certify that I am permitted to submit this grant request on behalf of the jurisdiction listed above. *
  ☐ Yes
- *If you are unsure who is permitted to make grant requests on behalf of your jurisdiction, we encourage you to consult your county or city attorney.*
- Your initials *
  [_____] Initials of Requester

10

- Today's Date

  09-15-2020    Date

https://form.jotform.com/202445110530135

42.    CTCL, on its website, answers the question "Why is CTCL providing grants

to election offices?":

> Election officials have made it clear that one of their most pressing needs is funding.
> Based on this, CTCL is focusing philanthropic support to directly help election
> offices administer safe and secure elections in November.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

43.    CTCL, on its website, answers the question "Who is providing the grant?":

> CTCL is a publicly supported 501(c)(3) nonprofit organization. CTCL is proud to
> have a healthy mix of financial support from foundations, individual donors, and
> through earned revenue. By law, CTCL's financial 990s are available for public
> review. Grant funds will be disbursed from the Center for Tech and Civic Life.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

44.    CTCL, on its website, answers the question "What kind of election expenses

do the grant funds cover?":

> Election offices can use the funds to cover certain 2020 expenses incurred between
> June 15, 2020 and December 31, 2020. These include, but are not limited to, the costs
> associated with the safe administration of the following examples of election
> responsibilities.

**Ensure Safe, Efficient Election Day Administration**

- Maintain open in-person polling places on Election Day
- Procure Personal Protective Equipment (PPE) and personal disinfectant to protect election officials and voters from COVID-19
- Support and expand drive-thru voting, including purchase of additional signage, tents, traffic control, walkie-talkies, and safety measures

**Expand Voter Education & Outreach Efforts**

- Publish reminders for voters to verify and update their address, or other voter registration information, prior to the election
- Educate voters on safe voting policies and procedures

**Launch Poll Worker Recruitment, Training & Safety Efforts**

- Recruit and hire a sufficient number of poll workers and inspectors to ensure polling places are properly staffed, utilizing hazard pay where required
- Provide voting facilities with funds to compensate for increased site cleaning and sanitization costs
- Deliver updated training for current and new poll workers administering elections in the midst of pandemic

**Support Early In-Person Voting and Vote by Mail**

- Expand or maintain the number of in-person early voting sites
- Deploy additional staff and/or technology improvements to expedite and improve mail ballot processing

See https://www.techandciviclife.org/our-work/election-officials/grants/.

45.     CTCL, on its website, answers the question "How do I know that my office is eligible to receive a grant?":

> If your U.S. election office is responsible for administering election activities covered by the grant, you're eligible to apply for grant funds.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

46.     CTCL, on its website, answers the question "How much money is my office eligible to apply for?":

> Your election office will be eligible to apply for a grant amount based on a formula that considers the citizen voting age population and other demographic data of your jurisdiction. Minimum grants will be $5,000. You may choose to receive less than the offered amount if your needs or eligible expenses do not reach that amount.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

47.     CTCL, on its website, answers the question "What if I share election responsibilities with another local government office?":

> If you share election responsibilities with another local government office, you are encouraged to submit one combined application for grant funds. This means you'll coordinate with your other local government offices.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

48.     CTCL, on its website, answers the question "What information does my office need to provide in the grant application?":

> You will need to provide the following information in your grant application:
> - Number of active registered voters in the election office jurisdiction as of September 1, 2020
> - Number of full-time staff (or equivalent) on the election team as of September 1, 2020
> - Election office 2020 budget as of September 1, 2020
> - Election office W-9
> - Local government body who needs to approve the grant funding (if any)
> - What government official or government agency the grant agreement should be addressed to

See https://www.techandciviclife.org/our-work/election-officials/grants/.

49.     CTCL, on its website, answers the question "Who should submit the application for my election office?":

> Your election office's point of contact for the grant should submit the grant application. We leave it to you to determine who should be the point of contact.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

50.     CTCL, on its website, answers the question "When can I submit my application?":

> You'll be able to submit your grant application beginning the week of Tuesday, September 8, 2020.

13

See https://www.techandciviclife.org/our-work/election-officials/grants/.

51.    CTCL, on its website, answers the question "When will my office receive the grant?":

> We recognize that election jurisdictions need funding as soon as possible to cover the unprecedented expenses of 2020 elections. We plan to move quickly! After you submit your application, CTCL anticipates that the certification and approval of your grant will take about 2 weeks. The disbursement timeline will depend on your local approval process.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

52.    CTCL, on its website, answers the question "Will the grant be mailed via check or transferred via wire?":

> Wiring the grant funds is faster, but you can receive the funds via a mailed check if preferred.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

53.    CTCL, on its website, answers the question "What reporting is required?":

> You will be required to submit a report that indicates how you spent the grant funds. The report will be in a format that should not be overly burdensome.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

54.    CTCL, on its website, answers the question "When do I report how my office spent the funds?":

> You'll need to submit your grant report by January 31, 2021.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

**CTCL's private federal election grants are targeted toward counties and cities with demographics that show overwhelmingly progressive voters.**

55.     The local governments that CTCL have funded have demographics with overwhelmingly progressive voters. For example, Wayne County, Michigan, voted in 2016 for Hillary Clinton at a 94.95% rate over Donald Trump.

56.     As the chart below shows, CTCL's private federal election grants are targeting counties and cities with demographics showing high rates of progressive voters.

57.     Only one of the top 18 grants went to a city or county carried by Trump and that grant was for $289,000 while the remaining $51,317,215 when to D counties.  In other words, a total of 0.005 (or ½ of 1%) of the total funds in the 18 largest grants provided by CTCL went to counties or cities where Trump won in 2016.  Accordingly, 99.5% of the funds went to counties or cities carried by Clinton in 2016.

| County | CTCL Grant | Clinton | Trump | D |
|--------|-----------:|--------:|------:|---|
| Dallas County, TX | $15,130,433 | 60.22% | 30.44% | D |
| Philadelphia, PA | $10,000,000 | 84.30% | 15.32% | D |
| Harris County, TX | $9,600,000 | 54.20% | 41.8% | D |
| Fulton County, GA | $6,000,000 | 68.89% | 27.40% | D |
| Cobb, GA | $5,600,000 | 48.89% | 46.69% | D |
| Wayne County, MI | $3,512,000 | 96.83% | 2.18% | D |
| Delaware, PA | $2,200,000 | 65% | 35% | D |
| Bexar, TX | $1,900,000 | 54.19% | 40.76% | D |
| Cameroon, TX | $1,800,000 | 64.60% | 32.10% | D |
| Hinds, MS | $1,500,000 | 71.39% | 26.69% | D |
| Centre, PA | $863,828 | 48.71% | 46.32% | D |
| Richland, SC | $730,000 | 64.01% | 31.10% | D |
| Charleston, SC | $695,000 | 50.64% | 42.78% | D |
| Lucas, OH | $544,624 | 56.10% | 38.32% | D |
| Hays, TX | $289,000 | 49.50% | 50.40% | R |
| Onondaga, NY | $286,960 | 53.89% | 40.13% | D |
| Scott, IA | $286,870 | 47.50% | 46% | D |
| Blackhawk, IA | $267,500 | 50.60% | 43.30% | D |
| **Total:** | **$61,206,215** | **60.52%** | **35.37%** | |

58.     Fulton County, Georgia in 2016 voted for Hillary Clinton at a 68.89% rate over Donald Trump.

**CTCL's 2020 private federal election grants**

59.     In 2020, CTCL has provided private federal election grants to cities and counties in at least Pennsylvania, Michigan, Wisconsin, Iowa, Texas, Minnesota, South Carolina and Georgia.

60.     All these states have something in common: state legislatures who will not accept CTCL's private federal elections grants.

61.     So, CTCL, to accomplish its objective of turning out progressive votes in the urban counties and cities, has circumvented these state legislatures by recruiting local governments to apply and agree to accept CTCL's private federal election grants.

62.     CTCL's private federal election grants to counties and cities in Pennsylvania, Michigan, Wisconsin, Minnesota, Iowa, Texas, South Carolina and Georgia were not approved by Congress nor by the respective state legislatures.

63.     Recently, the CTCL provided a $6 million private federal election grant to Fulton County.

64.     CTCL's private federal election grant to Fulton County was not approved by Congress nor by the Georgia state legislature.

**The Secretary of State under Georgia law, not CTCL, apportions federal and state election grants to the counties and cities.**

65.     The Secretary of State under Georgia law, not CTCL, apportions federal and state election grants to the counties and cities.

66.     On March 27, 2020, the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was signed into law.

67.     The Act included $400 million in new Help America Vote Act (HAVA) emergency funds, made available to states to prevent, prepare for, and respond to the coronavirus for the 2020 federal election cycle.

68.     This supplemental appropriation funding, distributed by the U.S. Elections Assistance Commission (EAC), provides states with additional resources to protect the 2020 elections from the effects of the novel coronavirus.

69.     Georgia's share of this federal funding is $10,875,912. An additional 20% match or $2,175,182 from Georgia state funds brought the total amount of the award to $13 million.

70.     Additionally, on December 20, 2019, the federal Consolidated Appropriations Act of 2020 was signed into law. The Act included $425 million in new Help America Vote Act (HAVA) funds, made available to states to improve the administration of elections for Federal Office, including to enhance technology and make election security improvements.

71.     The 2020 HAVA Election Security Fund, authorized under Title I Section 101 of the Help America Vote Act (HAVA) of 2002, was the second new appropriations for HAVA grants since FY2010.

72.     This funding was to provide states with additional resources to secure and improve election administration.

73.     Georgia's share of this federal funding is $11,601,395. An additional 20% match or $2,320,279 from Georgia state funds brought the total amount of the award to $13.8 million.

74.     The Secretary of State directed that portions of both the grants would be expended directly by Georgia for statewide efforts such as election security and technology enhancements for the counties and state, post-election audit implementation, training and support for election officials, notifying and educating voters of the change in primary date and the opportunity for all voters to vote by mail, providing precinct protection kits containing masks, sanitizers, and other supplies to all counties, voting processes, including additional costs for printing and mailing ballots, ballot tracking software, high speed scanners and letter opening equipment, mail drop boxes, hardware and software associated with signature comparison of returned ballots.

**CTCL's private federal election grants are to increase voter participation within Georgia's progressive demographic groups which can be accomplished without creation of a public-private partnership regarding Georgia's administration of federal elections.**

75.     CTCL's private federal election grants are to increase voter participation of Georgia's progressive demographic groups.

76.     CTCL's goal of increasing progressive voter participation can be accomplished without the funding through Georgia's counties and cities.

77.     Instead, CTCL could spend the funds directly on get-out-to-vote (GOTV) efforts like other non-profits do.

78.     Therefore, for CTCL to accomplish its goal of increasing progressive voter participation in Georgia, it is unnecessary for there to be a public-private partnership between CTCL and the Georgia's local governments regarding federal election administration.

## COUNT I

**Fulton County acts ultra vires, without legal authority, to form public-private partnerships for federal election administration with CTCL by accepting and using CTCL's private federal election grant, because preemption applies under the Elections Clause, Supremacy Clause, HAVA, and NVRA.**

79.    The Plaintiffs incorporate this complaint's previous paragraphs.

80.    Fulton County acted ultra vires, without legal authority, to form a public-private partnership for federal election administration with CTCL by accepting and using CTCL's private federal election grant, because preemption applies under the Elections Clause, Supremacy Clause, HAVA, and NVRA.

81.    The Center for Tech and Civic Life (CTCL) has distributed or is about to distribute private federal election grants, totaling over $6,000,000 to the Defendant.

82.    But, HAVA left discretion to the "states," not the counties and cities, on how to implement federal elections:

> The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.[3]

83.    Federal election law defines the word "state":

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.[4]

84.    So, under federal election law, Fulton County is not a "state."

---

[3] 52 U.S. Code § 21085, Pub. L. 107–252, title III, § 305 (Oct. 29, 2002), 116 Stat. 1714.

[4] 52 USC § 21141.

85.     Accordingly, Fulton County has no legal authority to form public-private partnerships for federal election administration nor to accept and use private federal election grants.

86.     The following federal laws and state laws preempt Georgia counties and cities from accepting and using private federal election grants: U.S. Constitution's Elections Clause and Supremacy Clause, National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501-20511, Help America Vote Act, 52 USC §§ 20901-21145.

87.     Because of the preemptive effects of these laws, Georgia counties and cities act ultra vires, without legal authority, by accepting and using CTCL's private federal election grants.

88.     The Plaintiffs are entitled to prospective declaratory and injunctive relief.

89.     Specifically, the following laws preempt the Fulton County actions of approving and using CTCL's private federal election grants.

**U.S. Constitution's Elections Clause and Supremacy Clause**

90.     The U.S. Constitution, Article I's Elections Clause and Article VI's Supremacy Clause preempt CTCL's private federal elections grants to local governments.

91.     The Elections Clause states:

> Time, place, and manner of holding. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators.

U.S. Constitution, Art. I, section 4, clause 1.

92.     The Supremacy Clause states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Constitution, Art. VI, para. 2.

93.     The Elections Clause, as applied here, ensures that the federal government and state legislatures determine the time, place and manner of federal elections—not CTCL and local governments.

94.     The Supremacy Clause, as applied here, ensures that local governments do not act contrary to federal and state law regarding federal elections.

95.     The Elections Clause and Supremacy Clause preempt CTCL's private federal election grants to local governments.

96.     CTCL's private federal election grants are not legally authorized by federal law nor state law.

97.     Fulton County have acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants and forming the public-private partnership with CTCL for federal election administration.

**CTCL's $6,000,000 of private federal election grants to Defendant is a constitutionally impermissible public-private partnership.**

98.     CTCL $6,000,000 of private federal elections grants to Defendant is a constitutionally impermissible public-private partnership.

99.     The case law shows that CTCL's private federal election grant is in a subject area, federal election administration, where public-private partnerships are constitutionally impermissible.

100.    The federal courts have a tradition in different subject areas of drawing a line where public-private partnerships are constitutionally impermissible. Federal elections are a subject where the federals should hold that private-public partnerships are constitutionally impermissible.

101.    *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group. The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law. The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.*  The court stated that the government favoring a demographic group was equivalent to the government disfavoring a demographic group:

> Historically, the law has focused on forms of "improper influence" that have interfered with the voting rights of disfavored demographic groups by dissuading or preventing them from voting through blatant means like fraud, violence, and intimidation. A government certainly violates the Elections Clause if it skews the outcome of an election in this manner. Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups. In both situations, the government has diminished the voting rights of one portion of the electorate and enhanced the voting rights of another portion of the electorate. In neither case is the election "free and equal."

*Id.*

102.    In *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), the U.S. Supreme Court drew such a line finding a public-private partnership constitutionally impermissible. In *Kiryas*, the New York legislature sought to create a homogenous school district for Satmar Hasidic Jews and did so by statute. This "religious"

motive was improper for the state and the statute forming the new district was stuck down. *Id.* at 691.

103.    Similarly, in *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (U.S. 2001), the U.S. Supreme Court held another public-private partnership unconstitutionally impermissible. Here, the local prosecutor, concerned about crack babies, teamed up with the local hospital to develop a program seeking to prevent expecting mothers from using cocaine during the pregnancy. They developed a program where the hospital would test for the presence of cocaine and provide a program to help with abstinence. If the patient refused, the results were shared with the prosecutor's office which in turn would encourage participation at the threat of prosecution. The U.S. Supreme Court found the entanglement of public and private interests sufficient to conclude the blood test by the hospital was a Fourth Amendment violation by the state. *Id.* at 86.

104.    Similarly, the entanglement of public and private interests involved with Fulton County accepting and using CTCL's private federal election grants is constitutionally impermissible.

105.    The idea of the federal and state government exclusively funding federal elections is to eliminate undue influence and the appearance of undue influence by private parties.

106.    CTCL's private funding of federal elections re-introduces undue influence and the appearance of undue influence into federal elections—which is constitutionally impermissible.

**Help America Vote Act (HAVA)**

107.    The Help America Vote Act (HAVA), 52 USC § 209, preempts CTCL's private federal election grants for the following reasons.

108.    HAVA established the Election Assistance Commission (EAC) to assist the states regarding HAVA compliance and to distribute HAVA funds to the states.

109.    EAC is also charged with creating voting system guidelines and operating the federal government's first voting system certification program.

110.    EAC is also responsible for maintaining the National Voter Registration form, conducting research, and administering a national clearinghouse on elections that includes shared practices, information for voters and other resources to improve elections.

111.    HAVA requires that the states implement the following new programs and procedures:

- Provisional Voting
- Voting Information
- Updated and Upgraded Voting Equipment
- Statewide Voter Registration Databases
- Voter Identification Procedures
- Administrative Complaint Procedures

In the past, Georgia's HAVA plan, required by HAVA, was approved by the EAC.

112.    HAVA's purpose was to coordinate federal and state administration of federal elections.

113.    HAVA does not legally authorize local governments to accept private federal election grants.

114.    HAVA's preemption prohibits local governments from accepting private federal election grants.

115.    Under HAVA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way.

116.    The CTCL's private federal election grants circumvent the EAC and the states and thus conflict with HAVA.

117.    Under HAVA, the EAC and the states work toward election plans and budgets.

118.    CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election administration plans and budgets—thus, conflicting with HAVA.

119.    The federal and state money distributed to county and city clerks that administer elections are distributed pursuant to a legally-authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for election purposes.

120.    Local governments accepting CTCL's private federal election grants, violate HAVA by injecting money into federal elections which is not approved by the EAC or the states.

121.    States are not allowed to deviate from plans submitted under HAVA. Local governments accepting CTCL's private federal election grants, violate HAVA.

122.    The CTCL's private federal election grants to local governments are not part of HAVA.

123.    Georgia and its Secretary of State, consistent with HAVA and under the EAC's guidance, has already approved a fiscal plan for its elections.

124.    The CTCL's private federal election grants to the Georgia's counties and cities circumvent and violate that fiscal plan.

125.    In Georgia, it is too late for the state to modify its plan around CTCL's private federal election grants to ensure the legally authorized, uniform and fair election HAVA requires.

126.    The Supremacy Clause, as applied to HAVA, ensures that Georgia counties and cities do not act contrary to HAVA regarding federal elections.

127.    HAVA preempts CTCL's private federal election grants to the counties and cities.

128.    Under the Supremacy Clause and HAVA, CTCL's private federal election grants are not legally authorized by federal law or state law.

129.    Fulton County has acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grant and forming the public-private partnership with CTCL for federal election administration.

**National Voters Registration Act (NVRA)**

130.    National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501–20511, preempts CTCL's private federal election grants for the following reasons.

131.    Congress enacted the National Voter Registration Act of 1993 (also known as the "Motor Voter Act"), to create "national procedures for voter registration for elections for Federal office." 52 U.S.C. § 20503.

132.    The Act gave responsibility to the Federal Election Commission (FEC) to provide States with guidance on the Act, to develop a national mail voter registration form,

and to compile reports on the effectiveness of the Act. A 2002 amendment in HAVA transferred the FEC's responsibilities under the Act to the EAC.

133.    Section 5 of the NVRA requires states to provide individuals with the opportunity to register to vote at the same time that they apply for a driver's license or seek to renew a driver's license, and requires the State to forward the completed application to the appropriate state or local election official. 52 U.S.C. § 20504.

134.    Section 6 of the NVRA provides that citizens can register to vote by mail using mail-in-forms developed by each state and the Election Assistance Commission. 52 U.S.C. § 20505.

135.    Section 7 of the NVRA requires states to offer voter registration opportunities at all offices that provide public assistance and all offices that provide state-funded programs primarily engaged in providing services to persons with disabilities. Each applicant for any of these services, renewal of services, or address changes must be provided with a voter registration form of a declination form as well as assistance in completing the form and forwarding the completed application to the appropriate state or local election official. 52 U.S.C. § 20506.

136.    Section 8 of the NVRA also creates requirements for how States maintain voter registration lists for federal elections. 52 U.S.C. § 20507.

137.    NVRA's purpose was to coordinate federal and state administration of voter registration for federal elections and to create legally authorized, nationwide, and uniform standards for voter registration.

138.   NVRA does not legally authorize local governments to accept private federal election grants for voter registration.

139.   NVRA's preemption prohibits local governments from accepting private federal election grants for voter registration.

140.   Under NVRA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way on voter registration for federal elections.

141.   The CTCL's private federal election grants to Defendants circumvent the EAC and the states and thus conflicts with NVRA.

142.   Under NVRA, the EAC and the states work toward voter registration plans and budgets.

143.   CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election voter registration administration plans and budgets—thus, conflicting with NVRA.

144.   The federal and state money distributed to county and city clerks that conduct voter registration are distributed pursuant to a legally-authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for voter registration.

145.   Local governments accepting CTCL's private federal election grants, violate NVRA by injecting money into federal election voter registration which is not approved by the EAC or the states.

146.   States are not allowed to deviate from the NVRA. Local governments accepting CTCL's private federal election grants violate NVRA.

147.    The CTCL's private federal election grants to local governments are not part of NVRA.

148.    Georgia and its Secretary of State, consistent with NVRA and under the EAC's guidance, has already approved a fiscal plan for voter registration for federal elections. The CTCL's private federal election grants to Fulton County circumvent and violate that fiscal plan.

149.    In Georgia, it is too late for the state to modify its plan in response to CTCL's private federal election grants to ensure the legally authorized, uniform and fair election NVRA requires.

150.    The Supremacy Clause, as applied to NVRA, ensures that Georgia counties and cities do not act contrary to NVRA regarding federal elections.

151.    NVRA preempts CTCL's private federal election grants to Fulton County.

152.    Under the Supremacy Clause and NVRA, CTCL's private federal election grants are not legally authorized by federal law or state law.

153.    Fulton County has acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

## Prayer for Relief

Therefore, the Plaintiffs respectfully ask that this Court to:

1.    Grant declaratory relief that Fulton County has acted ultra vires, acted without legal authority, in accepting CTCL's private federal election grants.

2.      Issue an injunction enjoining Fulton County from accepting or using CTCL's private federal election grant, or items purchased with CTCL's private federal election grant, and similar private federal election grants.

3.      Issue an injunction enjoining Georgia counties or cities from soliciting or participating in public private partnerships with CTCL unless the same are first approved by the State of Georgia.

4.      Award the Plaintiffs all costs, expenses, and expert witness fees allowed by law;

5.      Award the Plaintiffs attorneys' fees and costs allowed by law; and

6.      Award the Plaintiffs such other and further relief as this Court deems just.

Dated: October 9, 2020

_Electronically signed by /s/ Michael Hirsh_
Michael Hirsh, GA No. 357220
Special Counsel for the Amistad Project of
Thomas More Society
Hirsh & Heuser, LLC
125 TownPark Drive, Suite 300
Kennesaw, GA  30144
Telephone: 404-713-4400
E-mail: mrhirsh@hirshandheuser.com

Erick G. Kaardal, Minn. No. 229647*
Special Counsel to Amistad Project
of the Thomas More Society
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Facsimile: 612-341-1076
Email: kaardal@mklaw.com
_Attorneys for Plaintiffs_
*Admission application pending or
forthcoming